COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Willis and Bumgardner
Argued at Richmond, Virginia


DANTE SHAW

MEMORANDUM OPINION[*] BY
v.    Record No. 2670-00-1      JUDGE JAMES W. BENTON, JR.
                                JULY 31, 2001
CITY OF NEWPORT NEWS DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
H. Vincent Conway, Jr., Judge

(Kevin M. Diamonstein, on brief), for
appellant.  Appellant submitting on brief.

Christina A. Walsh, Assistant City Attorney
(Allen L. Jackson, Chief Deputy City
Attorney, on brief), for appellee.

Argument but no brief by Richard H. Lewis,
Jr., Guardian ad litem for the child.


Dante Shaw contends that the record does not contain clear

and convincing evidence supporting the judgment terminating his

parental rights.  We disagree and affirm the judgment.

I.

The evidence proved that a child was born to Lawanda

Worthington on September 6, 1992.  Worthington, who was in the

custody of the City of Newport News Department of Social Services,

later was hospitalized for a mental illness.  After the Department

---

* Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

obtained custody of her child in 1993, Worthington gave to the Department a name of a man she identified as the child's father. When paternity tests excluded that man as the father, Worthington identified Shaw as the child's father. In 1997, paternity tests confirmed that Shaw, who was then incarcerated in prison, was the father.

The Department notified Shaw that he was the child's father and obtained from him names and addresses of relatives who might care for the child during Shaw's incarceration. Letters, which were sent from the Department to relatives of Shaw, were produced at trial but not offered as exhibits. When the contacts with relatives were not productive, the Department contracted with Family Methodist Services "to continue to work with . . . Shaw to identify more potential relatives and to try to link the agency to those relatives."

A case worker employee of the Department testified that the Department sent copies of the service plans to Shaw but that the child was not taken to the prison to visit Shaw. She testified that prison visits are not necessarily provided when a parent is in prison and that the decision whether to do so is "done on a case-by-case basis." The case worker also testified that the child is in a foster home and adjusting well to the foster home. She further testified that the child has been "diagnosed with ADHD, reactive attachment disorder, and developmental coordination disorder."

-

A family therapist testified about the variety of services she has rendered the child from 1995 through 2000, the child's psychological difficulties, and the medication the child receives. She also testified that she has had discussions with the child about her father without divulging "specifics about him." She reports that the child has vacillated between "lik[ing] to know who [her father] is . . . to expressing real terror that he would . . . take her away from her foster mother, and [having] . . . tremendous anxiety associated with that and along with the anxiety was another fantasy image of her father as a very negative figure." The therapist also testified as follows:

> Q: Contacts with the father, would that have strengthened a parent/child relationship?
>
> A: It would only have introduced [the child] to her father as an acquaintance who had the nominal title of being her father. It would not have been a parent/child relationship in the sense that a parent is a caretaker for a child.
>
> Q: And what effect would contact with her father have on [the child]?
>
> A: At this point, I believe it would produce tremendous anxiety, again re-arousing fears of being separated from her foster mother.
>
> Q: Are there any counseling services that you could offer that would lessen that effect on the child?
>
> A: The only counseling service that could be offered that would have any real benefit would be contingent on Mr. Shaw being a free man and being available for intensive work.

-

Q: And what effect if permanency was not -- if the agency did not achieve permanency for [the child] at this time and waited the four years remaining for Mr. Shaw to complete his time, what effect would that have on [the child]?

A: You mean if in four years she were placed in his care?

Q: Yes. What effect would it have for [the child] to wait four more years for her father to be free from incarceration?

A: [The child] feels very much that she is in limbo right now. She wants closure. She wants a family because she knows that her only family right now is her foster mother and she wants to proceed with that relationship.

Q: What would your recommendation be then for [the child] at this time?

A: My recommendation would be that she be allowed to remain with her foster mother and that exploration of her foster mother as an adoptive parent proceed.

Shaw testified that when he last saw Worthington in 1992 she was pregnant and he was twelve years old. He did not become aware he was the child's father until the Department contacted him in 1997. Shaw testified that his release date from prison is 2004 and that he has the possibility of early release in September 2002 with his "good time." He also testified that after he gave the Department names of relatives who might assist him in this matter, the Department did not provide him any other services. He testified, however, that when he received a foster care plan that detailed the child's difficulties, he believed

-

the Department "was lying or just trying to get [him] to give [his] rights away."  Although he was told he could write to the child by sending correspondence to the Department, he only sent a birthday card in 1998.  Shaw testified he did not wish to have his parental rights terminated.

In his ruling from the bench, the trial judge cited Shaw's incarceration, Shaw's lack of contact with the child, and, most significantly, the child's need for stability in her life.  Commenting on Shaw's argument that more could have been done to help with the parenting, the judge said:  "Well, I'm not sure what.  The man is incarcerated.  Meanwhile, this child is aging."  This appeal followed the judge's order terminating Shaw's residual parental rights.

## II.

In pertinent part, Code § 16.1-283(C)(2) provides that "[t]he residual parental rights of a parent . . . of a child placed in foster care as a result of court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child" and that the following conditions exist:

> The parent or parents, without good
> cause, have been unwilling or unable within
> a reasonable period of time not to exceed
> twelve months from the date the child was
> placed in foster care to remedy
> substantially the conditions which led to or
> required continuation of the child's foster
> care placement, notwithstanding the
> reasonable and appropriate efforts of

-

> social, medical, mental health or other
> rehabilitative agencies to such end. Proof
> that the parent or parents, without good
> cause, have failed or been unable to make
> substantial progress towards elimination of
> the conditions which led to or required
> continuation of the child's foster care
> placement in accordance with their
> obligations under and within the time limits
> or goals set forth in a foster care plan
> filed with the court or any other plan
> jointly designed and agreed to by the parent
> or parents and a public or private social,
> medical, mental health or other
> rehabilitative agency shall constitute prima
> facie evidence of this condition. The court
> shall take into consideration the prior
> efforts of such agencies to rehabilitate the
> parent or parents prior to the placement of
> the child in foster care.

Because "'[r]easonable and appropriate' efforts can only be
judged with reference to the circumstances of a particular
case," Ferguson v. Dep't of Social Servs., 14 Va. App. 333, 338,
417 S.E.2d 1, 4 (1992), we have held that the trial judge "must
determine what constitutes reasonable and appropriate efforts
given the facts before the court." Id. at 338-39, 417 S.E.2d at
4.

Shaw argues that the Department made only "minimal efforts"
to assist him. The trial judge found, however, that, under the
circumstances, the Department's actions were reasonable and that
Shaw's incarceration limited the agency's capacity to remedy
Shaw's deficiencies as a parent. In Ferguson, we held as
follows:

> [W]hile long-term incarceration does not,
> per se, authorize termination of parental

-

> rights or negate the Department's obligation to provide services, it is a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the child will be served by termination.

Id. at 340, 417 S.E.2d at 5.

The evidence in this record proved that beyond the biological fact of parentage, no relational history existed between the child and Shaw.  Shaw was not aware he was the child's father until the Department contacted him in 1997, and he had never developed any type of relationship with the child.  When given the opportunity to contact the child, he only sent a birthday card.  In addition, the evidence is undisputed that the Department was unsuccessful in its efforts to place the child with Shaw's relatives during his incarceration.

The record contains expert testimony that these conditions when combined with Shaw's current incarceration would require intensive resources and would not lead to the establishment of a parent/child relationship while Shaw was incarcerated.  That testimony further indicated that the child needed stability to ensure improved development and that direct contact with Shaw would be detrimental to the child.  As in Ferguson, the trial judge "placed emphasis upon this expert testimony," id., and found that the agency had fulfilled its duties under the statute.  We will not disturb this finding because the record

-

indicates that it was not plainly wrong or without evidence to support it.  Martin v. Pittsylvania County Dep't of Social Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

We hold that this record supports by clear and convincing evidence the trial judge's finding that the best interests of the child would be served by terminating Shaw's parental rights pursuant to Code § 16.1-283(C)(2).  Accordingly, we affirm the judgment.

Affirmed.